FILED: July 16, 2009



IN THE SUPREME COURT OF THE STATE OF OREGON


FRIENDS OF THE COLUMBIA GORGE, INC.,
COLUMBIA RIVERKEEPER, COLUMBIA GORGE HOTEL CO,
1000 FRIENDS OF OREGON,
CLAUDIA CURRAN, ERIC LICHTENTHALER,
JACK MILLS, KATE MILLS,
PHIL PIZANELLI, DIXIE STEVENS,
BRIAN WINTER, and CYNTHIA WINTER, 

Petitioners
on Review, 

v. 



COLUMBIA RIVER GORGE COMMISSION, 

Respondent
on Review. 



(CA A125031; SC S055722)



En Banc



On review from the
Court of Appeals.*



Argued and submitted
October 29, 2008.



Gary K. Kahn, of
Reeves, Kahn & Hennessy, Portland, argued the cause and filed the briefs
for petitioners on review Friends of the Columbia Gorge, Columbia Riverkeeper,
Columbia Gorge Hotel Co., Claudia Curran, Eric Lichtenthaler, Jack Mills, Kate
Mills, Phil Pizanelli, Dixie Stevens, Brian Winter, and Cynthia Winter.  With
him on the briefs was Mary Kyle McCurdy, Portland, for petitioner on review 1000
Friends of Oregon.



Jeffrey B. Litwak,
White Salmon, Washington, argued the cause and filed the brief for respondent
on review.



James E. Mountain,
Jr., of Harrang Long Gary Rudnick P. C., Portland, filed the brief for amicus
curiae Pacific States Marine Fisheries Commission.  With him on the brief
was Jona J. Maukonen, Portland.  Also on the brief was John Shurts, Portland,
for amicus curiae NW Power and Conservation Council.







Erin C. Lagesen,
Assistant Attorney General, Salem, filed the brief for amicus curiae
State of Oregon.  With her on the brief were Hardy Myers, Attorney General, and
Mary H. Williams, Solicitor General.



GILLETTE, J.



The decision of the Court of Appeals is affirmed in part and reversed in part. The revisions to the management plan are upheld in part and invalidated in part, and the case is remanded to the Columbia River Gorge Commission for further proceedings.




*Judicial review of order of the Columbia River Gorge Commission. 215 Or App 557, 171
P3d 942 (2007).



GILLETTE, J.

Petitioners, who are individuals,
businesses and conservation organizations with connections to the Columbia
River Gorge, sought judicial review by the Court of Appeals of the Columbia
River Gorge Commission's (commission) 2004 revision of its management plan for
the Columbia River Gorge National Scenic Area.  Before that court, petitioners
argued, in numerous assignments and subassignments of error, that various
aspects of the 2004 revision violated the Columbia River Gorge National Scenic
Area Act, 16 USC §§ 544-544p.  The Court of Appeals rejected all but one of
petitioners' subassignments of error.  Friends of Columbia Gorge v. Columbia
River Gorge, 215 Or App 557, 171 P3d 942 (2007).  We allowed petitioners'
petition for review, which challenges the various standards of review that the
Court of Appeals employed in considering petitioners' claims, as well as a
number of the Court of Appeals' substantive holdings.  For the reasons that
follow, we affirm the Court of Appeals decision in part, reverse it in part,
and remand the case to the commission for further proceedings.  

Because a general understanding of
the Act and its relationship to the commission and the management plan is necessary
to an understanding of the issues in this case, we provide the following background. 
In 1986, Congress passed the Columbia River Gorge National Scenic Area Act, Pub
L 99-663, §§ 2-18, 100 Stat 4274 (1986), now codified at 16 USC §§ 544-544p.  The
Act states two purposes:  (1) to create a national scenic area in Washington
and Oregon "to protect and provide for the enhancement of the scenic,
cultural, recreational, and natural resources of the Columbia River
Gorge"; and (2) to protect and support the economy of the area "by
encouraging growth to occur in existing urban areas and by allowing future
economic development in a manner that is consistent with" the first
purpose.  16 USC § 544a.  The Act creates the Columbia River Gorge National
Scenic Area, § 544b, a designated area of land that lies adjacent to the Columbia
River in Oregon and Washington.  It also authorizes those two states to enter
into an interstate compact and to create a regional commission, which, in
cooperation and consultation with the United States Secretary of Agriculture
(the secretary), is charged with developing, implementing, and administering a management
plan for the scenic area.  16 USC §§ 544c, 544d.

The Act itself establishes a
framework and a process for developing the contemplated management plan.  First,
it divides the land in the scenic area into three categories:  (1) "Special
Management Areas" (SMAs), over which the Secretary of Agriculture is to
have primary responsibility; (2) "Urban Areas," which the Act largely
exempts from the commission's control; and (3) all remaining areas, which would
come to be known as the "General Management Area" (GMA).  16 USC §§
544b(b), (e).  Next, the Act directs the commission to carry out various
studies and inventories of the features, uses, and resources of all land within
the scenic area.  16 USC § 544d(a).  It then requires the commission to use the
resulting studies and inventories to designate areas within the scenic area
that are suitable for specified uses -- agriculture, forest production, open
space, and commercial and residential development.  16 USC § 544d(b).  Finally,
it instructs the commission to produce a land use management plan that
incorporates those land use designations, is consistent with certain specified standards
(set out below), and provides specific guidelines for the adoption of land use
ordinances within the scenic area.(1) 
16 USC § 544d(c).  

The aforementioned
"standards" essentially amount to a requirement that the management plan
include certain protective provisions.  In particular,   


"[t]he management plan and all land use
ordinances and interim guidelines adopted pursuant to [the Act] shall include
provisions to: 

"(1) protect and enhance agricultural lands
for agricultural uses and to allow, but not require, conversion of agricultural
lands to open space, recreation development or forest lands;

"(2) protect and enhance forest lands for
forest uses and to allow, but not require, conversion of forest lands to
agricultural lands, recreation development or open spaces;

"(3) protect and enhance open spaces;

"(4) protect and enhance public and private
recreation resources and educational and interpretive facilities and
opportunities, in accordance with the recreation assessment adopted pursuant to
subsection (a) of this section;

"(5) prohibit major development actions in
special management areas, except for partitions or short plats which the
Secretary determines are desirable to facilitate land acquisitions pursuant to [this
Act];

"(6) prohibit industrial development in the
scenic area outside urban areas;

"(7) require that commercial development
outside urban areas take place without adversely affecting the scenic,
cultural, recreation, or natural resources of the scenic area; 

"(8) require that residential development
outside urban areas take place without adversely affecting the scenic,
cultural, recreation, or natural resources of the scenic area; and

"(9) require that exploration, development
and production of mineral resources, and the reclamation of lands thereafter,
take place without adversely affecting the scenic, cultural, recreation, or
natural resources of the scenic area."


Id. at § 544d(d).

The commission is required to consult
with federal, state, and local governments in developing the management plan
and must conduct public hearings and solicit public comment before finally
adopting it.  Id. at § 544d(e).  Once the commission adopts a management
plan, it must submit it to the secretary for review and concurrence.  Id.
at § 544d(f).  Once that concurrence has been obtained (or the commission
has overridden any objections by the secretary by a two-thirds vote), each of
the six counties within the scenic area (three in Oregon, three in Washington) must
adopt land use ordinances that are consistent with the management plan.  Id.
at § 544e.

The management plan is subject to periodic
review and revision.  Under section 544d(g), the commission is required to review
the management plan at least every ten years "to determine whether it
should be revised."  As with the original management plan, it is required
to submit "any revised management plan to the Secretary for review and
concurrence."  Id.

Pursuant to the Act, Oregon and
Washington adopted the Columbia River Gorge Compact, which established the Columbia
River Gorge Commission and provided for funding of that body.  The legislatures
of Oregon and Washington ratified the compact shortly thereafter, and the
statutes reflecting that ratification appear, respectively, at ORS 196.150 and
RCW 43.97.015.  Commission members were appointed and the commission commenced
work.(2) 
In 1991, the commission completed a management plan and the secretary concurred
in that plan in 1992.  Thereafter, the management plan controlled land
management decisions within the scenic area (except in the Urban Areas).(3)

In 1997, the commission began the
process of reviewing the original management plan "to determine whether it
should be revised," as the Act requires.  16 USC § 544d(g).  In the
initial stage of that review, which took some time, the commission created a
list of topics within the management plan that the commission believed required
revision or, at least, further consideration.  However, the commission thereafter
lost much of the funding that it had depended on to carry out its review and, therefore,
decided that it should confine its review to a smaller, select group of issues. 
Over the next few years, the commission worked on revising the management plan with
respect to those selected issues and, in April 2004, it adopted a revised management
plan(4)
that incorporated the revisions.(5) 

Following the management plan's adoption,
petitioners timely filed a petition for judicial review of the plan in the
Oregon Court of Appeals, as authorized by ORS 196.115.(6) 
They argued that various aspects of the management plan violated the
requirements of the Act and also argued that the commission's review process
was incomplete because the Act required it to review the entire management
plan.  

As noted, the Court of Appeals remanded
the management plan to the commission for reconsideration of one minor issue,
but otherwise affirmed it.   Petitioners sought review by this court,
challenging the Court of Appeals' resolution of 11 separate issues.  We
consider those challenges in turn, setting out additional facts that are pertinent
to the issue under consideration as to each.

1.  Did
the Court of Appeals state and apply an erroneous standard of review insofar as
it held that, to succeed on a claim that the plan violates the Act, petitioners
must demonstrate that the plan cannot be applied consistently with the Act
under any circumstances?   

Petitioners' first three challenges
pertain to standards of review that the Court of Appeals applied to petitioners'
claims that various aspects of the management plan violated the Act.  First,
petitioners argue that the Court of Appeals erred when it held that, to prevail
on any of its challenges to policies and guidelines in the management plan,
petitioners "must demonstrate that the plan cannot be applied consistently
with the law under any circumstance."  Friends of Columbia Gorge,
215 Or App at 568.  Petitioners contend that, to the contrary, they need only
show that the challenged policies and guidelines depart from or contravene a
legal standard expressed or implied in the Act.   

Notably, the Act itself provides no
standards for reviewing actions and orders of the commission, but appears to
leave such details to the courts that are authorized to perform such reviews. 
Federal courts generally apply the standards of review provided in the federal
Administrative Procedures Act (APA), 5 USC §§ 500-706, see, e.g., Friends
of Columbia Gorge, Inc. v. Schafer, No CV 04-1423-MO, WL 5070962 at § 4 (D
Or, Nov 24, 2008) (applying 5 USC § 706(2)(A)), and Washington courts apply the
standards of review set out in the Washington Administrative Procedures Act,
RCW § 34.05, and common law.  See, e.g., Friends of Columbia Gorge. Inc. v.
Columbia River Gorge Com'n, 126 Wash App 363, 369-70, 108 P3d 134 (2005)
(demonstrating principle).  In Oregon, however, the legislature has enacted a
statute, ORS 196.115, that governs judicial review of commission actions in
Oregon courts.  It provides that review of final actions and orders of the commission
shall be conducted, initially, in the Court of Appeals, and that the court's
review "shall be in accordance with" various provisions of the Oregon
Administrative Procedures Act (the Oregon APA), ORS 183.310 to 183.750, pertaining
to judicial review of orders in contested cases.  ORS 196.115(2), (3)(a).  Moreover,
and in addition to referencing those Oregon APA contested case
provisions, the statute somewhat redundantly spells out a standard of review
that is almost identical to the one that Oregon courts are required to apply under
the Oregon APA to orders in contested cases: 


"(c) The court may affirm, reverse or
remand the order.  If the court finds that the agency has erroneously
interpreted a provision of law and that a correct interpretation compels a
particular action, the court shall:

"(A) Set aside or modify the order; or 

"(B) Remand the case to the agency for
further action under a correct interpretation of the provision of law.

"(d) The court shall remand the order to
the agency if the court finds the agency's exercise of discretion to be:

"(A) Outside the range of discretion
delegated to the agency by law;

"(B) Inconsistent with an agency rule, an
officially stated agency position or a prior agency practice, unless the
inconsistency is explained by the agency; or

"(C) Otherwise in violation of a
constitutional or statutory provision.

"(e) The court shall set aside or remand
the order if the court finds that the order is not supported by substantial evidence
in the whole record."


ORS 196.115(3)(c) - (e).

In considering the standard of review
issue in the present case, the Court of Appeals acknowledged the foregoing
statutory standard, but noted that the standard is "less than a perfect
fit" with petitioners' challenges, because it calls for application of the
kind of review used in contested cases, while the commission's acts under
review are essentially legislative in nature.  Friends of Columbia
Gorge, 215 Or App at 568.  The court opined that petitioners' challenges amounted
to a facial challenge to the lawfulness of the management plan and concluded
that, to prevail on such a claim, petitioners "must demonstrate that the
plan cannot be applied consistently with the law under any circumstance." 
Id.  In support of that standard of review, the court cited MacPherson
v. DAS, 340 Or 117, 138-39, 130 P3d 308 (2006) and United States v.
Salerno, 481 US 739, 745, 107 S Ct 2095, 95 L Ed 2d 697 (1987), as cases
setting out the test for a challenge to the facial legality of an agency created
rule.

However, as petitioners correctly
observe, neither MacPherson nor Salerno is authority for
application of the Court of Appeals' "not-lawful-under-any-circumstances"
standard.  Both cases involved a claim that a statute was inconsistent
with a constitutional provision -- in particular, the Due Process Clause
of the Fourteenth Amendment to the United States Constitution.  Although it is
true that some authority in the federal courts supports applying that standard when
reviewing an agency's regulations for inconsistency with its authorizing
statute,(7)
this court, so far as we can determine, has never applied that standard to
anything other than a constitutional challenge to a statute.  

Neither do we think that this is a
case that justifies applying that standard of review, so foreign to the administrative
law of this state, to what at bottom simply are challenges to the validity of an
administrative rule.  In that regard, we observe that the management plan, both
in its original and its revised form, is much like a "rule," as that
term is defined in the Oregon APA, i.e., it is "any agency
directive, standard, regulation or statement of general applicability that implements,
interprets or prescribes law or policy, or describes the procedure or practice
requirements of any agency." ORS 183.310(9).  Moreover, the plan was
adopted and revised by the commission through a process similar to the
rulemaking process prescribed in the Oregon APA at ORS 183.335.  Although the commission
is not a state agency that is directly subject to the Oregon APA, it is clear
that petitioners' challenges to the management plan are analogous to typical "facial"
challenges to the validity of a rule under the Oregon APA.  In our view,
judicial review should proceed accordingly.

Petitioners urge this court to conduct
its review using the methodology of Planned Parenthood Assn. v. Dept. of
Human Res., 297 Or 562, 687 P2d 785 (1984).  In Planned Parenthood, this
court set out the following standard for reviewing similar "facial"
challenges to the validity of an administrative rule:   


"In the proper sequence of analyzing the legality of
action taken by officials under delegated authority, the first question is
whether the action fell within the reach of their authority, the question which
in the case of courts is described as 'jurisdiction.'  If that is not an issue
* * * the question is whether the action was taken by procedures prescribed by
statute or regulation.  Assuming that proper procedures were followed, the next
question is whether the substance of the action, though within the scope of the
agency's or official's general authority, departed from a legal standard
expressed or implied in the particular law being administered, or contravened
some other applicable statute."  


Id. at 565 (emphasis added).  We agree with
petitioners that the quoted Planned Parenthood standard is consistent
with the legislatively prescribed statutory standard at ORS 196.115(3)(c) to (e)
and, particularly, with subparagraphs ORS 196.115(3)(d)(A) and (C), which
provide for remand to the agency if the court finds the challenged action to be
"outside the range of discretion delegated to the agency by law" or
"[o]therwise in violation of a constitutional or statutory
provision."  That standard, and not the different standard of review that
the Court of Appeals utilized, is the appropriate one for petitioners' facial
challenges to the lawfulness of the management plan.

2.  Did
the Court of Appeals err in holding that, when commission actions are reviewed
in Oregon courts, the deferential standard of review set out in Chevron USA  v.
Natural Res. Def. Council, 467 US 837, 104 S Ct 2778, 81 L Ed 2d 694 (1984)
applies? 

As noted, petitioners contend that the
management plan is inconsistent, in various respects, with the requirements of
the Act.  To assess the validity of those claims, it is necessary to determine
what the Act requires.  Consequently, our review of petitioner's claims
generally will involve some interpretation of the Act.  

In interpreting the Act, we follow
the methodology that federal courts have prescribed for interpreting federal
statutes, just as we would do in interpreting any other federal statute.   Corp.
of Presiding Bishop v. City of West Linn, 338 Or 453, 463, 111 P3d 1123
(2005).  In general, that means examining the text, context, and legislative
history of the statute.  Id.  However, there is an additional
methodological wrinkle when, as in the present case, one of the parties before
the court is the agency that has been charged with implementing the statute that
is to be interpreted.  A long line of federal cases, beginning with Chevron
U.S.A. v. Natural Res. Def. Council, 467 US 837, 842-44, 104 S Ct 2778, 81
L Ed 2d 694 (1984), holds that, when a federal agency has been charged by
Congress with implementing a federal statute, courts should defer to that
agency's interpretation of the statute, treating that interpretation as controlling
as long as it is reasonable.  See, e.g., Nat'l Ass'n of
Homebuilders v. Defenders of Wildlife, 551 US 644, ___, 127 S Ct 2518,
2534, 168 L Ed 2d 467 (2007); Barnhardt v. Walton, 535 US 212, 215, 122
S Ct 1265, 152 L Ed 2d 330 (2002); Rust v. Sullivan, 500 US 173, 184,
111 S Ct 1759, 114 L Ed 2d 233 (1991) (each stating same rule).  Although that
sort of deference is foreign to the administrative law of this state,(8)
we are bound to apply it in our interpretation of federal statutes if the
federal interpretive methodology so demands.  

The remaining methodological question
in this case, however, is whether the federal methodology would require
deference by a federal court to the commission's interpretation of the Act,
given the fact, among others, that the commission is not, strictly speaking, a federal
agency charged by Congress with implementing a federal law.  The Court
of Appeals concluded that, although the commission is not a federal agency, Chevron
deference to its interpretations of the Act is appropriate because the commission
is "a creation of federal law," it is authorized to implement federal
law, and "the usual rationales for deference to agency construction" therefore
should apply to its interpretations of the Act.  Friends of Columbia Gorge,
215 Or App at 570.(9)

Petitioners argue, however, that the commission
is not a creation of federal law but, instead, is the creation of an
interstate compact that Congress authorized but did not require Oregon and
Washington to adopt.  From that premise, petitioners argue that the commission
is not the recipient of delegated authority from Congress but, instead, derives
its authority from state law, insofar as Washington and Oregon chose to create
the commission and to assign to it its present powers.  Finally, petitioners
observe that the Act expressly states that the commission "shall not be
considered an agency or instrumentality of the United States for the purpose of
any federal law," 16 USC § 544c(a)(1)(A) (emphasis added),
including (they argue) the federal judicially created law relating to deference
to agencies' statutory constructions.

For its part, the commission argues
that, even if it is not directly a creature of federal law, the
interstate compact that created it is more federal in nature than not, insofar
as it incorporates federal law (the Act), pertains to subject matter of
national interest, and required Congress's express consent.  The commission
concludes that Chevron deference therefore is appropriate.  The commission
also argues that applying Chevron deference in Oregon courts to the commission's
interpretations of the Act is desirable because it "brings a degree of
consistency and uniformity to the states' judicial review of commission actions
involving interpretation of the federal Scenic Area Act that would not occur if
the state courts use their own state law."  The commission notes, in that
regard, that federal and Washington state courts have applied Chevron to
the commission's interpretations of the Act.  Finally, the commission points to
what it characterizes as a "solid history" in federal courts of
applying Chevron deference to interstate compact agencies'
interpretations of their own organic statutes.(10) 
 The commission suggests that this court should follow suit.

The commission's last two points are
unpersuasive.  First, given that Chevron is a mainstay in the federal
courts, the fact that federal courts have applied Chevron deference to compact
agencies' interpretations of federal statute may simply have been reflexive.  In
the absence of any explicit and authoritative holding that all courts should defer
to compact agencies' interpretations of their (federal) organic statutes, regardless
of differences between the particular compact agencies' powers, the review
provisions in the statutes at issue, and the reviewing courts' ordinary
practices, we are not inclined to follow the cited cases without conducting our
own analysis of the question.

The commission's argument for applying
Chevron as a means of ensuring uniformity in judicial review also is unpersuasive. 
Although we agree with the commission that variation in judicial review
methodologies could undermine uniformity of land use standards within the
scenic area, such variation appears entirely consistent with, and may even be
contemplated by, the Act.  We note, in that regard, that the Act specifically places
jurisdiction to review appeals taken from commission actions in the state
courts of Washington and Oregon, but does not specify any standard of
review.  One Washington court has responded to that circumstance by applying
the standards of review set out in its own administrative procedures act when
it is called upon to review a commission action,(11)
while Oregon courts use a standard of review that the legislature specifically
adopted for review of commission actions, now codified at ORS 196.115(3)(c) to
(e).  Although we acknowledge that the interpretation of statutes arguably is a
different matter, the fact that the Act by omission creates a situation in
which Oregon and Washington are free to apply different standards of review to commission
actions suggests that uniform treatment may not be the objective that
Congress sought to achieve under the Act, as the commission suggests.

In the end, we think that the
applicability of Chevron turns on a single question -- whether the
federal interpretive methodology (which, as discussed, we are bound to apply)
would require it.  And the answer to that question, as it turns out, is itself a
function of congressional intent:  The United States Supreme Court, which first
announced the Chevron standard, has explained the standard in terms of a
congressional intent or expectation -- specifically, a congressional
expectation, implied from the agency's "general conferred authority"
and other circumstances, that the agency will "be able to speak with the
force of law when it addresses ambiguity in the statute or fills a space in the
enacted law."  United States v. Mead Corp., 533 US 218, 229, 121 S
Ct 2164, 150 L Ed 2d 292 (2001); see also Smiley v. Citibank (South
Dakota), N.A., 517 US 735, 740-41, 116 S Ct 1730, 135 L Ed 2d 25 (1996) (Court
accords deference to agencies under Chevron because of a presumption
that Congress, "when it left ambiguity in a statute [that was] meant for
implementation by an agency, understood that the ambiguity would be resolved,
first and foremost by the agency [rather than the courts.]").  According
to the Court, when circumstances suggest that such an intent or expectation
exists, 


"a reviewing court has no business rejecting an
agency's exercise of its generally conferred authority to resolve a particular
statutory ambiguity simply because the agency's chosen resolution seems unwise,
but is obliged to accept the agency's position if Congress has not previously
spoken to the point at issue and the agency's interpretation is
reasonable."


Mead Corp., 533 US at 229 (citations omitted).  

It follows that, to resolve whether
the commission's interpretations of the Act are entitled to Chevron
deference, we must determine whether the commission's "generally conferred
authority" or other aspects of the Act imply a congressional expectation
that the commission will "speak with the force of law" when it
addresses ambiguities and gaps in the statute.(12)
 A strong indicator of such an expectation, according to the cases, is express
congressional authorization to engage in rulemaking and adjudication with
respect to the matters under review.  See, e.g., EEOC v. Arabian American
Oil Co., 499 US 244, 257, 113 L Ed 2d 274, 111 S Ct 1227 (1991)  (suggesting
that no deference is warranted when agency is not authorized to promulgate
rules).  That inference is particularly strong when that authorization provides
for formal administrative procedures designed to "foster the fairness and
deliberation that should underlie a pronouncement of such force."  Mead
Corp., 533 US at 230.  

Applying the foregoing considerations
to the present case, it appears that, to the extent that the management plan
purports to carry out the purposes of the Act in a way that includes resolving
ambiguities in or filling in gaps in the Act, the commission is entitled to Chevron
deference.  The Act clearly contains gaps that the commission is charged with filling. 
Indeed, Congress has directed the commission to "adopt a management plan
for the scenic area," which must be based on resource inventories and land
use designations that the Act requires the commission to develop, which must be
"consistent with" certain specified statutory standards, 16 USC §
544d(c)(1)(2) and (3), and which, once adopted, will effectively control land
use actions within the scenic area, 16 USC § 544e.  That would seem to be the
precise sort of delegation of authority that, according to Mead and
similar cases, indicates a congressional expectation that the commission will
"speak with the force of law" in filling the significant gaps left
open by the statute.  Moreover, to the extent that the Act authorizes the commission
to develop and adopt a management plan (a documentary product that in every
relevant sense is a rule or a compilation of rules), requires the commission to
conduct public hearings and solicit public comment before adopting a final management
plan, 16 USC § 544d(e), and requires the commission to adopt and follow other administrative
procedures that would appear to be designed to foster fairness and
deliberation, 16 USC § 544c(b),(13)
the commission stands well within the mainstream of agencies whose
interpretations of their organic statutes have been deemed worthy of Chevron
deference.

Petitioners argue that Chevron
is a federal doctrine that applies only to agencies and instrumentalities of
the United States, and that, whatever else it may be, the commission is not
a federal agency.  Petitioners note, in that regard, that the Act expressly
provides that the commission "shall not be considered an agency or
instrumentality of the United States for the purpose of any Federal Law." 
16 USC § 544c(a)(1)(A).  However, none of the federal cases that discuss and
apply Chevron to agency actions appears to focus on the agency's status
as a federal agency.  Although the cases, of necessity, generally do pertain
to federal agencies, their focus is on the nature of Congress's delegation of
authority to the agency, rather than the agency's federal status.  

Petitioners also argue that the commission
is not a recipient of a congressional delegation of authority but, instead,
derives its authority from an interstate agreement and, thus, from the two
member states.  Petitioners acknowledge that Congress gave consent for
Oregon and Washington to enter into an interstate compact, but it notes that Congress
did not require the states to do so.  Petitioners contend that, under
those circumstances, Oregon and Washington must be deemed to have created the commission
and to be the source of its authority to develop and implement the management plan.


We disagree.  The Act reveals a far
greater Congressional role in the creation of the commission and the
development of the management plan than petitioners' argument acknowledges.  In
addition to memorializing Congress's consent to an interstate compact, the Act provides
for the formation of an interstate commission to administer that compact,
describes in relatively fine detail the structure of that body and how its members
will be appointed, requires the commission to adopt a management plan,
describes the process that the commission must use for developing the management
plan, and provides standards to which the resulting management plan must
adhere.(14) 
In short, even if Oregon and Washington are the parties who enter into the
compact, it is a compact of Congress's design.  Of particular relevance here,
it is Congress -- not the states -- that determined what powers and
responsibilities would be delegated to the commission and what procedures the commission
must follow in carrying out its responsibilities.   

In the end, we conclude that, in 16
USC §§ 544 -544p, Congress delegated authority to the commission that, under
the federal methodology that we are bound to apply, implies a congressional
expectation that the commission will "speak with the force of law"
when it addresses ambiguities and gaps in the statutory scheme.  The commission's
interpretations of the Act therefore are entitled to the level of deference that
the Chevron doctrine prescribes.  That means that, if the Act is
ambiguous with respect to some matter, the commission's construction must be
upheld, unless it is unreasonable. Chevron, 467 US at 842-44.

3.  Should
courts defer to the commission's interpretations of the Act that are
articulated for the first time on appeal?

As petitioners point out, a
conclusion that the Chevron doctrine applies in this case on judicial review
does not mean that any and every interpretation of the Act that the commission might
offer to this court is entitled to deference.  Federal courts do not, for
example, accord Chevron deference to post hoc rationalizations
offered by an agency's lawyers, when the agency itself has not articulated a
position on the issue.  Bowen v. Georgetown University Hospital, 488 US
204, 212-13, 109 S Ct 468, 102 L Ed 2d 493 (1988).(15)
 Neither shall we.  But our acceptance of that distinction in principle does
not mean that we agree with petitioners that the Court of Appeals improperly
deferred to various interpretations of the Act that the commission articulated
in its briefs.  That determination must be made on an argument-by-argument (or
interpretation-by-interpretation) basis.   

4.  Does
the management plan comply with the Scenic Area Act's mandate to protect scenic
resources from cumulative adverse effects?

The Scenic Area Act provides, among
other things, that the contemplated management plan "shall include
provisions to * * * require" that commercial, residential, and mineral
resource development occurring outside of urban areas "take place without adversely
affecting the scenic, cultural, recreation, or natural resources of the
scenic area."  16 USC §§ 544d(d)(7), (8), and (9) (emphasis added).  For
purposes of those and all other provisions of the Act, "adversely
affecting" is defined as 


"a reasonable likelihood of more than moderate adverse
consequences for the scenic, cultural, recreation or natural resources of the
scenic area, the determination of which is based on 

"(1) the context of a proposed action;

"(2) the intensity of a proposed action, including the
magnitude and duration of an impact and the likelihood of its occurrence;

"(3) the relationship between a proposed action and
other similar actions which are individually insignificant but which may have
cumulatively significant impacts; and 

"(4) proven mitigation measures which the proponent of
an action will implement as part of the proposal to reduce otherwise
significant affects to an insignificant level."


16 USC § 544(a) (emphasis added).

Based on the foregoing provisions,
petitioners argued to the Court of Appeals that the plan must include standards
that protect the Gorge's scenic resources from adverse effects, including cumulative
adverse effects, caused by commercial, residential, and mineral resources
development.  Petitioners asserted that the management plan violates that
requirement insofar as it contains "no standards, guidelines, criteria, or
methodology for determining what causes cumulative adverse impacts to scenic
resources, how to measure such impacts, or how they are regulated."(16)

The Court of Appeals concluded,
however, that 


"the Act contains no provision requiring the commission
to spell out specific standards for determining, in advance, what causes
adverse cumulative impacts to scenic resources.  To the contrary, the Act makes
quite clear that what constitutes an 'adverse effect,' of which cumulative
effects are a component, is a matter determined in the context of specific
applications in light of their intensity, their relationship with other similar
actions, and any mitigation measures that may be required.  16 USC § 544(a). 
The statute is unambiguous on that point.  But even if that were not so, we
would arrive at the same conclusion under the deferential standard that Chevron
requires.  The commission's reading of the Act to not require more detailed a
priori standards for determining adverse cumulative effects is at least a
reasonable construction of the statute."   


Friends of Columbia Gorge, 215 Or App at 586.

Petitioners argue that the Court of
Appeals is wrong about what the Act requires.  They contend, first, that the
Act "expressly requires the commission to include 'standards' in the management
plan for preventing adverse effects to scenic resources, 16 USC § 544d(d), and
the Act's definition of 'adversely affect' includes cumulative impacts, 16 USC §
544(a)(3)."  We note, respecting this argument, that the three provisions
at issue, 16 USC §§ 544d(d)(7), (8), and (9), require the commission to include
"provisions" in the management plan that "require" that
commercial, residential, and mineral resource development take place without
adversely affecting scenic resources.  The requirement that the management plan
itself include such provisions is a "standard" that the management plan
must meet, but nothing in the Act states that the required provisions must themselves
take the form of "standards." 

Still, we agree with petitioners that
standards of some sort are required.  The relevant provisions, 16 USC §§
544d(d)(7), (8) and (9), direct the commission to include provisions in the management
plan that "require" that development occur without causing more than "moderate"
adverse effects, including adverse cumulative effects, to scenic
resources.  If those requirements are to be enforceable, implementing agencies
must have some basis for determining when they have -- or have not -- been met.
 The management plan must contain provisions that by some means "require"
that residential, commercial, and mineral resource development occur without
causing adverse cumulative effects to scenic resources.(17)

The commission responds that the management
plan does contain such provisions.  It points, first, to a guideline that
provides:


"Determination of potential visual effects and compliance
with visual subordinance policies shall include consideration of the cumulative
effects of proposed developments." 


Management Plan, Part I, ch 1 (Scenic Resources), GMA
Provisions, Key Viewing Areas, GMA Guidelines 3.  The referenced "visual subordinance
policies" appear to be summarized by a related policy,(18)
which provides, in part, that, 

"[e]xcept for new production and/or development of
mineral resources, new development on lands seen from key viewing areas[(19)] shall be visually
subordinate to its landscape setting."  


Management Plan, Part I, ch 1 (Scenic Resources), GMA
Provisions, Key Viewing Areas, GMA Policies 2.(20)
 A related guideline similarly provides:


"Each development shall be visually subordinate to its
setting as seen from key viewing areas."   


Management Plan, Part I, ch 1 (Scenic Resources), GMA
Provisions, Key Viewing Areas, GMA Guidelines 2.

The commission also contends that the
plan regulates and precludes cumulative adverse effects on scenic resources at
a "landscape setting" level.  It notes that the management plan
describes and maps 13 different "landscape settings"(21)
occurring in the scenic area and sets out various policies and guidelines that are
directed at "maintaining the integrity" of each of them.  For example,


"[n]ew developments shall be compatible with their
landscape setting and maintain the integrity of that setting.  Expansion of
existing developments shall be compatible with their landscape setting and
maintain the integrity of that setting to the maximum extent possible."


Management Plan, Part I, ch 1 (Scenic Resources), GMA
Provisions, Landscape Settings, GMA Policies 1.  And


"[m]aintenance of landscape settings shall be a key
consideration in determining minimum parcel sizes for GMA land use
designations."


Id., GMA Policies 4.

Finally, the commission observes that
the 2004 revisions include provisions calling for development and
implementation of "scenic highway corridor strategies" for Interstate
84 and SR 14, the two principal highways that run through the Gorge, which strategies
would include design guidelines directed at protecting scenic resources along
those corridors.(22) 
The import of those provisions and design guidelines to the present
"cumulative effects" issue is unclear, but we assume that the commission
points to them as evidence that it has developed, and will continue to develop,
guidelines designed to maintain overall scenic conditions at a certain
level along the I-84 and SR-14 corridors, thereby protecting scenic resources along
those corridors from adverse cumulative effects.(23)

We are persuaded that at least some
of the cited provisions "require" that commercial, residential, and
mineral resource development take place without adversely affecting scenic
resources.  In particular, the Key Viewing Areas policies and guidelines require
each new development to be "visually subordinate" to the relevant
"setting" or "landscape setting" and expressly provide that
the determination of visual subordinance must include an assessment of
cumulative effects.  When those "key viewing areas" policies and guidelines
are read together, it is clear that the management plan requires implementing
agencies to make such a cumulative impacts determination each time that they
are presented with a development application, and to prohibit development that would
adversely affect scenic resources.  

Petitioners' argument reflects a
basic dissatisfaction with the management plan's case-by-case approach to cumulative
impacts, perhaps because petitioners believe that the responsible agencies --
the counties -- have not meaningfully implemented it.  But that problem -- if
it exists -- relates to how the counties apply the management plan, not to the plan's
consistency with the Act.  We conclude that the provisions in the management plan
requiring planners to take cumulative impacts into account when determining,
for each development proposal, how the visual subordinance standard can be
achieved, are consistent with 16 USC §§ 544d(d)(7), (8), and (9) and 16 USC §
544(a)  -- that is, the plan contains provisions requiring that development in
the scenic area take place without causing adverse effects, including
cumulative effects, to scenic resources.    

As noted, the commission also
contends that certain of the guidelines and policies in the management plan
reflect a "landscape setting" approach to the requirement that
development occur without causing adverse cumulative effects to scenic
resources.  As we discuss below in analyzing a similar question relating to
adverse cumulative effects on natural resources, such a landscape-based
approach theoretically could fulfill the statutory requirements that development
occur without causing adverse cumulative effects.  However, we have no occasion
to consider the particulars of the commission's theory with respect to adverse
cumulative effects on scenic resources, because we already have concluded that
the management plan fulfills the statutory requirements at issue insofar as it requires
consideration of adverse cumulative effects before development is permitted.  In
short, we conclude that the management plan complies with the statutory
requirements at issue.  The Court of Appeals correctly rejected petitioners'
claim of error in that regard.

5.  Is the
policy that the parties identify as "GMA Scenic Resource Policy 1"
inconsistent with the Act insofar as it allows development projects that will
adversely affect scenic resources to go forward?  

The revisions to the management plan
include a scenic resources policy that provides:


"Except for production and/or development of mineral
resources and disposal sites for spoil materials from public road maintenance
activities, nothing in the key viewing areas or landscape settings guidelines
in this chapter shall be used as grounds to deny proposed uses otherwise
authorized by the land use designation.  However, the guidelines may affect the
siting, location, size, and other design features of proposed developments, and
compliance with them is mandatory."  


Management Plan, Part I, ch 1 (Scenic Resources), GMA
Provisions, Overall Scenic Provisions, GMA Policies 1.

Petitioners argue that that policy is
inconsistent with provisions in the Act -- specifically, 16 USC §§ 544d(d)(7), (8), and (9) -- that
require that development take place without adversely affecting scenic
resources.  Petitioners contend that the policy can be read in only one way --
as requiring implementing agencies to approve proposed developments that do not
comply with the management plan's scenic protection guidelines and that
therefore "adversely affect" scenic resources.(24)

The commission, in its brief to this
court, appears to accept petitioners' assessment that the challenged policy
requires agencies to approve projects that do not comply with key viewing areas
and landscape setting guidelines.  However, the commission argues that
petitioners are wrong in assuming that a failure to meet key viewing area and
landscape setting guidelines necessarily results in an adverse impact on scenic
resources.  The commission notes that, according to the Act, the determination
of "adverse affect" requires consideration of the context of a
proposed action and other factors.  16 USC § 544(a)(1).  The commission
concludes that the requirement that the context of a proposal be considered 


"is important because if the context makes strict
compliance with the key viewing areas and landscape settings guidelines
impossible, then this policy allows some flexibility to permit agencies to
approve the development -- assuming, of course, that it does not cause an
adverse effect."


We do not accept either petitioners'
or the commission's explanation of the policy.  Although the first sentence of
the policy tells permitting agencies that they cannot use the scenic guidelines
as a basis for denying a proposed use, the second sentence
provides in no uncertain terms that compliance with the guidelines that control
siting, design, and other conditions of use -- which are designed to ensure
that scenic resources are not adversely affected -- "is mandatory."  The
two provisions do not conflict.  The second simply qualifies what would be an
absolute grant of authority in the first sentence, if that sentence stood
alone:  Although a county cannot deny an application for an otherwise
permissible use outright, the applicant must accept any conditions -- even
draconian ones -- that are necessary to ensure that the development take place
without affecting scenic resources and complies with the guidelines.(25) 
If the applicant does not or cannot sufficiently alter the proposal to satisfy
the conditions required by the second sentence, permission to carry out the
proposed activity must be denied.  Petitioners' argument in that respect claims
too much.

6. Does
the management plan comply with the Scenic Area Act's requirement that it
protect natural resources from cumulative adverse effects?

Petitioners' argument with respect to
this assignment of error recalls its earlier argument that the management plan
violates the Scenic Area Act's mandate to protect scenic resources from
cumulative adverse effects.  Petitioners again rely on the definition of
"adversely affect" in 16 USC § 544(a) (set out above, 346 Or at ___
(slip op at 22) and on 16 USC §§ 544d(d)(7), (8), and (9), which call for
provisions in the management plan "requir[ing]" that commercial,
residential, and mineral resource development occurring outside of urban areas
"take place without adversely affecting the scenic, cultural, recreation,
or natural resources of the scenic area."  They reasonably and correctly propose
that the management plan must include provisions that require that development not
cause more than moderate adverse effects, including adverse cumulative effects,
to natural resources in the scenic area.  And they argue (much as they did with
respect to the plan's treatment of scenic resources) that the management plan does
not include provisions of that sort.

The present inquiry differs from our
previous inquiry into the management plan's handling of cumulative effects to scenic
resources in one important respect:  The chapter of the management plan devoted
to protection of natural resources contains no policy or guideline that
is equivalent to the noted key viewing areas, guidelines that require that each
development shall be visually subordinate to its setting, the GMA, and that
explicitly require that determination of compliance with that visual
subordinance policy include consideration of cumulative effects.  Management
Plan, Part I, ch 1 (Scenic Resources), GMA Provisions, Key Viewing Areas,
GMA Guidelines 2, 3.  As discussed, those two guidelines, in combination, satisfy,
on a case-by-case basis, the statutory directive that the management plan
require that development take place without causing adverse cumulative effects
to scenic resources.  See 346 Or at __ (slip op at 28).

The commission agrees that, with
regard to natural resources, the management plan does not require a
case-by-case determination of whether a development causes any adverse
cumulative effect.  The commission asserts, however, as it did in the Court of
Appeals, that the Act does not require it to prevent adverse cumulative effects
on natural resources in any particular way and that it has chosen to confront
the issue using a "landscape approach" rather than through a proposal-by-proposal
examination of cumulative effects.  The commission cites ten provisions in the management
plan that, in its view, reflect that landscape approach.  They are:

Management Plan, Part II, ch 1 (Agricultural Land),
GMA Provisions, Large-Scale and Small-Scale Agriculture, GMA Policies, Land Use
Policies 5C (stating that, for land designated as Agricultural Land, minimum
lot sizes shall be established that are adequate to maintain agricultural
operation and that "[t]ake into account the common field size for crops or
livestock, adjacent uses, parcel sizes in the area, common size or economic
unit for farms and ranches in the area, the existing landscape setting, wildlife
habitat, scenic sensitivity, and other factors").

Management Plan, Part II, ch 2 (Forest Land), GMA
Provisions, GMA Policies, Land Use Policies 7 (stating that a minimum parcel
size "shall be established for the creation of new parcels on lands
designated Small Woodland, considering the common size of forest units in the
area, the impact on management efficiency, the existing landscape setting, wildlife
habitat, and other resource factors").

Management Plan, Part II, ch 4 (Residential Land),
GMA Provisions, GMA Policies, Land Use Policies 1C (stating that, on land
designated as Residential Land, minimum parcel sizes for land divisions shall
be based on, among other things, protection of wildlife habitat, plant habitat,
and wetlands).

Management Plan, Part II, ch 3 (Open Spaces), GMA
Provisions, GMA Policies 8 ("Those wetlands with remarkable values, such
as sensitive wildlife habitat or rare plant species, that are susceptible to
disturbance from use and development shall be designated Open Space.").

Management Plan, Part II, ch 3 (Open Spaces), GMA
Provisions, GMA Policies 9 ("Open Space designations shall be applied to
those most significant and sensitive natural areas that are susceptible to
disturbance from use and development.").

Management Plan, Part II, ch 3 (Open Spaces), GMA
Provisions, GMA Policies 11 ("Habitat areas of animal species that are
classified as endangered or threatened by federal or state endangered species
acts or the Washington Wildlife Commission may be designated Open Space.").


Management Plan, Part II, ch 5 (Commercial Land), GMA
Provisions, GMA Policies, Designation Policies 2 ("Areas outside Urban
Areas shall be designated as Commercial where commercial use took place in the
immediate past or is now taking place and would not adversely affect scenic, natural,
cultural, or recreation resources.").

Management Plan, Part II, ch 6 (Recreation
Designations), GMA Provisions, Public Recreation, GMA Policies 2 ("Lands shall
be considered highly suitable for Public Recreation designation if they possess
significant potential for providing two or more of [certain listed
recreational] opportunities, are readily accessible, and lack hazards or highly
sensitive resources.").

Management Plan, Part II, ch 6 (Recreation
Designations), GMA Provisions, Commercial Recreation, GMA Policies 2C ("Lands
may be considered highly suitable for Commercial Recreation uses if [among
other things] * * * [p]otential development on the site would not adversely
affect sensitive wildlife habitat or plants, wetlands, or aquatic or riparian
areas.  This may be achieved by either designing the development to avoid areas
containing such resources or by applying mitigation measure that reduce effects
on such resources to less than adverse levels.").

As can be seen, three of the cited provisions regulate the
determination of minimum parcel sizes in various land use designations, while
the remaining six provisions each set out a standard for determining whether
land is suitable for a particular land use designation.  The commission's
explanation of how those provisions accomplish what is required (i.e., that
development occur without adverse cumulative effects to natural resources) consists
of a single sentence:


"These guidelines take a landscape approach to
protecting against cumulative adverse impact to natural resources -- through
the assignment of land use designations and minimum parcel sizes -- i.e.,
pre-defining the types and amount of development appropriate to avoid
cumulative adverse effect on natural resources."


Before we consider the validity of
the commission's landscape approach, we focus on what the Act actually
requires.  Petitioners argue that, contrary to the commission's position, the
Act mandates a case-by-case approach to cumulative effects.  They note that the
Act's definition of the term "adversely affect" is written in terms
of the effects of "a proposed action," and that the determination of
"adverse effect" is to be based on, among other things, "the
relationship between a proposed action and other similar actions which are
individually insignificant but which may have cumulatively significant impacts." 
16 USC § 544(a).

We are not persuaded by petitioners'
analysis.  The relevant provisions in the act unambiguously focus on a result
-- that development will have no adverse effect, including cumulative
effects, to natural resources -- rather than on any particular method for
achieving that result.  See 16 USC §§ 544d(d)(7), (8), and (9).  And
because the statute is unambiguous on that point, deference to the commission's
interpretation of the Act is not relevant.  Although the Act may explain
"adverse effect" in terms of the effects of individual development
proposals, that does not mean that the commission could not adopt a broad
preventative approach:  The commission might, for example, create a comprehensive
system of landscape-based regulations limiting the amount and type of
development to such a degree that adverse cumulative effects could not occur.  But,
if the commission chooses to proceed in that way, the relevant provisions still
must fulfill the statutory mandate of requiring that development not
cause adverse cumulative effects to natural resources.  And that, we think, is the
place where the commission's argument fails.  

Certainly, some of the provisions
that the commission points to are designed to ensure, or would have the effect
of ensuring, that residential, commercial, and resource development do not
adversely affect natural resources in the particular land use designations
where they apply.  The three Open Space designation provisions cited by the
commission are examples.  Collectively, those provisions require that land with
the most significant and sensitive natural resources be placed in the
Open Space designation.  Under those provisions, there is no potential, on Open
Space land, for adverse cumulative effects caused by residential, commercial,
or mineral resource development.  That is so because, on Open Space land, no
residential, commercial, or mineral resource development is permitted at all.  


The provisions pertaining to
Commercial Recreation land designation also would seem to be designed to
preclude the possibility of adverse cumulative effects on natural resources on
Commercial Recreation land.  The commercial recreation policy cited by the commission
provides that land may be designated for Commercial Recreation uses only if
"potential development on the site would not adversely affect sensitive
wildlife habitat or plants, wetlands, or aquatic or riparian areas."  That
policy would not preclude cumulative adverse effects in itself, but it must be
read in light of a related provision (not cited by the commission), which
specifies:


"Lands may be considered highly suitable for Commercial
Recreation uses if * * *

"* * * * *

"Potential development on the site would
not have cumulative adverse effects upon scenic, cultural, natural or
recreation resources, considering other development (existing or authorized
in the management plan) in the Scenic Area or in the vicinity of the
development."


Management Plan, Part II, ch 6 (Recreation Designations),
GMA Provisions, Commercial Recreation, GMA Policies 2E.   

But most of the other provisions that
the commission cites do not accomplish what the cited Open Space and Commercial
Recreation provisions do.   For example, the minimum parcel size provisions for
land designated for Agricultural or Forest use (where a significant level of residential
development is permitted) merely require that wildlife habitat (a single
component of the Gorge's natural resources) be "tak[en] into account"
or "consider[ed]" when setting the minimum parcel size.  The
provisions contain no explicit or implied reference to adverse cumulative
effects and, more importantly, no requirement that decision-makers select a
minimum parcel size that eliminates any potential for adverse effects to
natural resources.    

It is true that the commission makes some
effort to use land use designations and minimum parcel size determinations
to eliminate the potential for adverse cumulative effects to natural
resources.  However, those efforts are incomplete.  For Agricultural and Forest
land and for a large portion of the land designated as Residential, there is no
provision that even remotely demonstrates that the landscape-level approach will
avoid or eliminate the adverse cumulative effects that the Act prohibits.  It
follows that the commission cannot successfully argue that, on a broad
landscape level, the management plan "requires" that development
occur without causing adverse cumulative effects to natural resources.

We already have noted (and the commission
has acknowledged) that no provision or standard requires case-by-case analysis
of the cumulative effects of commercial, residential, and mineral resource
development on natural resources.  Although such case-by-case review might not
be necessary if the commission had adopted adequate alternatives, we are unable
to discern any other provisions that might address the adverse cumulative
effect problem.  We conclude that the management plan fails to require that
residential, commercial, and mineral resource development take place without
causing adverse cumulative effects to natural resources.  In that respect, it
violates the Act.  The Court of Appeals erred in concluding otherwise. 

7.  Does
the management plan violate the Act insofar as it allows livestock grazing,
without any review of resource impacts, on most of the land in the scenic area?

Under the management plan, livestock
grazing is allowed "outright," i.e., without any review, on almost
all land use designations.  The only exceptions are Open Space land and
"Agriculture - Special land."  Management Plan, Part II, ch 7
(General Policies and Guidelines), Uses Allowed Outright, All Land Use Designations
Except Open Space, GMA/SMA Guidelines 1A (permitting "agricultural
uses" outright in all land designations except Open Space); Glossary
(defining "agricultural use" to include "feeding, breeding,
management and sale of livestock").  Petitioners argue that that
arrangement "violates the Act's mandate to protect and enhance natural
resources," because livestock grazing has a high potential for adversely
affecting, inter alia, fish and wildlife habitat.

As the commission points out,
petitioners posit a general statutory mandate to "protect and enhance
natural resources" that simply does not exist.  Certainly, the Act
provides that the management plan must "protect and enhance open spaces,"
16 USC § 544d(d)(3), which are defined, in part, in terms of natural resources
that are present on land designated as open space, 16 USC § 544(l).(26) 
But those natural resources are not relevant to petitioners' argument, because,
to the extent that grazing is allowed at all on Open Space land, it is subject
to review for "compliance with guidelines for the protection of * * *
natural * * * resources."  Management Plan, Part II, ch 3 (Open
Spaces), GMA Provisions, GMA Guidelines, Review Uses -- All Lands Designated
Open Spaces:  Gorge Walls and Canyonlands 1; Balch Lake Wetlands Area 1. The
Act also provides that the management plan must protect natural resources from
adverse effects caused by commercial, residential, and mineral resource uses,
16 USC §§ 544d(d)(7), (8), and (9), but it does not establish an equivalent
requirement with respect to adverse effects caused by agricultural activities
(such as grazing).  

Petitioners fall back on the fact
that one of the Act's stated purposes is "to establish a national scenic
area to protect and provide for the enhancement of the scenic, cultural,
recreational, and natural resources of the Columbia River Gorge."  16 USC
§ 544a(1).  However, given that the Act also purports to support and
protect the economy of the Gorge, 16 USC § 544a(2), that it clearly sets a high
value on agricultural uses, including grazing, as an important component of that
economy, 16 USC §§ 544d(b)(2) and (d)(1), and that it sets out, in specific
terms, the circumstances in which protection of natural and other resources
must take precedence over economic values,(27)
the broad statement of purpose at 16 USC § 544a(1) simply cannot be read as mandating
protection of all natural resources in all circumstances and in every
part of the Scenic Area.  

In short, we agree with the commission
that the Act does not require the management plan to protect all of the scenic
areas natural resources from adverse effects caused by agricultural uses.  It
follows that the commission has not violated the Act by allowing livestock
grazing operations in most of the scenic area without prior review to determine
how those operations will affect natural resources.  The Court of Appeals did
not err in rejecting that claim of error. 

8.  Does
the management plan violate the Act insofar as it fails to inventory and
protect geologic resources and require avoidance of residential and commercial
development within geological hazard areas?

Petitioners observe that the management
plan contains no guidelines that are specifically directed at protecting "geological
resources" or avoiding "geological hazards."  Petitioners argue
that the management plan's failure to address those topics amounts to a
violation of the Act.  Petitioners acknowledge that the Act nowhere uses the
terms "geologic resources" and "geological hazard areas." 
They argue, however, that geologic resources and hazards are "natural
resources" within the meaning of the Act and that, consequently, the Act
requires the management plan to inventory and protect geological resources
to the extent that it requires the plan to inventory and protect natural resources. 
Petitioners point to several provisions of the Act as relevant to that
proposition:  16 USC § 544a(1) (purpose of Act is to "protect and provide
for the enhancement of the * * * natural resources of the Columbia River
Gorge"); 16 USC §§ 544d(d)(7), (8), and (9) (management plan must include
provisions requiring that commercial, residential and mineral resource
development "take place without adversely affecting the * * * natural
resources of the scenic area) (emphasis added); 16 USC § 544d(a)(1)(A) (commission
shall complete a resource inventory documenting "all existing land uses, natural
features and limitations, * * *") (emphasis added); and 16 USC § 544d(c)(1)
(management plan must be "based on the results of the resource inventory
developed pursuant to subsection (a)(1) of this section").

The Court of Appeals rejected
petitioners' claim, but it did not directly decide whether "geological
resources" and "geological hazards" were "natural
resources" as that term is used in the Act.  Rather, the court appears to
have assumed that geological resources and hazards were covered by the
statutory term, and then to have concluded that nothing in the Act required the
management plan to specifically address them or any other category of
natural resources.  The court explained:


"Native plants are a natural resource in the scenic
area, but that does not mean that the Act requires the management plan to
include provisions specifically addressing the protection of each and every
one.  Likewise, fall foliage in the scenic area is a physical characteristic,
but that does not mean that the management plan must include provisions
specifically pertaining to that phenomenon.  If Congress had wanted such
specifics included in the commission's management plan, all it had to do was
say so."  


Friends of Columbia Gorge, 215 Or App at 596.

That explanation may be correct as
far as it goes, but it does not speak to the essential question.  The Act
provides that the management plan must include provisions requiring that
commercial, residential, and mineral resource development take place without
adversely affecting the scenic area's natural resources.  16 USC §§
544d(d)((7), (8), and (9).(28) 
If geological resources are natural resources within the meaning of the
Act, then the management plan must include provisions that will preclude
adverse effects to those resources -- whether or not those provisions specifically
identify "geological resources" as their object.  The management plan
could satisfy that requirement without any specific mention of geological
resources by, for example, setting out a catch-all provision directed at
protecting all "natural resources."  But the essential point
is that the management plan must protect all "natural
resources" -- whatever that term may encompass.  

It follows that the first order of
business, in evaluating petitioners' claim, is to determine whether geological
resources and hazards are in fact "natural resources" for purposes of
the Act.  The Act itself does not define that term, and the term is not one that
has obvious parameters.(29) 
In fact, the term conveys the very kind of ambiguity that, according to the applicable
standard of review,(30)
might warrant deference to the commission's reasonable construction of the
term.   

And here the difficulty arises.  As
petitioners note, the commission has construed the term:  The glossary
to the management plan defines "natural resources" to include "naturally
occurring features including land, water, air, plants, animals (including
fish), plant and animal habitat, and scenery."  That definition is sufficiently
broad that, whatever "geological resources" and "geological
hazards" might be, they fall within it.  Petitioners therefore conclude
that, because geological resources fall within the commission's own
definition of "natural resources," the commission must include
provisions to protect them in the management plan, as the Act requires.

But there is another
definition of the term "natural resources" that appears in the management
plan.  The chapter of the management plan that is devoted to "Natural
Resources" contains its own, narrower definition of the term:  "For
this chapter, natural resources mean wetlands, streams, ponds and lakes,
riparian areas, wildlife and wildlife habitat, rare plants, and natural areas."(31) 
Management Plan, Part I, ch 3 (Natural Resources).  Given that the
Natural Resources chapter is the single part of the plan that deals most
directly with the mandate that is the focus of petitioners' argument (that
natural resources be protected from adverse effects of commercial, residential,
and mineral resource development), it is arguable that that chapter definition,
and not the one that appears in the glossary, is the one that is relevant to
the present analysis. 

But is that definition of "natural
resources" -- the one that appears in the "Natural Resources"
chapter itself, and which clearly does not encompass the geological resources
and hazards that petitioners are concerned with -- sufficiently reasonable that
it can demand our deference under the Chevron doctrine?  It could be. 
As we have observed, 346 Or at ___ and n 29 (slip op at 44 and n 29), "natural
resources " is an indefinite term that, along with its clear basis in the
world of naturally occurring objects, conveys in a far more vague sense the
idea that those objects must be valuable or beneficial.  Thus, the narrower
definition now under discussion could reflect the commission's considered
determination as to which natural features of the scenic area are valuable in
that sense, and its list of phenomena that qualify as "natural
resources" is not inherently unreasonable.  Neither would it necessarily
be unreasonable that the commission had excluded a whole category -- geological
features -- from its definition of "natural resources."  The commission
could rationally conclude that many "geological resources," e.g.,
dirt qua dirt, are not valuable in and of themselves, and that
geological features that are valuable for a particular reason can and
should be protected as such -- for example, as scenic resources or as a
component of animal and plant habitat.

Our problem, however, is that we see
no real evidence of a conscious commission choice either way.  The management plan
itself contains two competing definitions, both of which the commission
apparently considers permissible under the Act.  As our discussion of each
definition indicates, we find both to be permissible under Chevron.  But
we decline to defer to the commission, unless and until it takes some action
that reflects a considered choice between the two definitions, or the
abandonment of one of them.  This case is being remanded to the commission for
other reasons.  We therefore also direct that the commission on remand
specifically address which of the two definitions of "natural
resources" it is relying on, preferably doing so in light of petitioners'
express concerns respecting areas of geologic hazard. 

9.  Does
the management plan comply with the Scenic Area Act's requirement that it
protect cultural resources from cumulative adverse effects? 

Petitioners here raise a further issue
pertaining to the management plan's treatment of cumulative adverse effects.  They
argue that, because the management plan does not (in their view) provide any
standards or mechanism for assessing the cumulative effects of development on cultural
resources, it does not and cannot satisfy the Act's mandates, set out at 16 USC
§§ 544d(d)(7), (8) and (9), that provisions be included that require that commercial,
residential, and mineral resource development take place without causing
adverse cumulative effects to those resources.  Petitioners again argue that,
in light of the proposal-based wording of the definition of "adversely
affected," those mandates must be read as requiring consideration of cumulative
effects at the time each development is proposed.  We reject that argument for
the same reason that we rejected it in the context of petitioners' arguments
about cumulative effects on natural resources:(32) 
The cited mandates unambiguously focus on a desired result (that development
shall have no adverse effects, including adverse cumulative effects, to
cultural resources), but they say nothing about how that result is to be
achieved.  The order in which petitioners wish to see the adverse effects
analyses carried out is not mandated by the Act.

A question remains as to whether the management
plan contains other provisions that satisfy those mandates.  The commission contends
that a number of provisions in the management plan speak to those mandates.  Specifically,
the commission relies on: 

Management Plan, Part I, ch 2 (Cultural Resources),
GMA Provisions, GMA Policies 5 ("Cultural resource surveys, evaluations,
assessments, and mitigation plans shall generally be conducted in consultation
with Indian tribal governments and any person who submits written comments on a
proposed use (interested person).").

Management Plan, Part I, ch 2 (Cultural Resources),
GMA Provisions, GMA Policies 6 (Until a cultural resource survey of the GMA is
complete, a reconnaissance survey shall be required for all proposed uses
except the modification, expansion, replacement or reconstruction of existing
buildings and structures and proposed uses that would involve little or no
ground disturbance.).

Management Plan, Part I, ch 2 (Cultural Resources),
GMA Provisions, GMA Policies 1 ("Generally, well defined geographic areas
that possess large concentrations of cultural resources shall be designated
Open Space.").

Management Plan, Part II, ch 4 (Residential Land),
GMA Provisions, GMA Policies, Land Use policies 1C(5) ("minimum parcel
sizes for land divisions shall be established, based upon,' among other things,
protection of 'cultural resources").

Management Plan, Part II, ch 6 (Recreation
Designations), GMA Provisions, Public Recreation, GMA Policies 2 (Lands shall
be considered highly suitable for Public Recreation designation if they possess
significant potential for providing certain listed public recreation
opportunities, including enhancement of cultural resources, and lack "highly
sensitive resources.").

Management Plan, Part II, ch 6 (Recreation
Designations), GMA Provisions, Commercial Recreation, GMA Policies 2D ("Lands
may be considered highly suitable for Commercial Recreation if," among
other things, "[p]otential development on the site would not adversely
affect significant cultural resources.").

The commission does not explain the import of those
provisions, except to say -- much as it did in response to petitioners' other
"cumulative effects" arguments -- that the management plan takes a
"landscape approach" to protecting cultural resources from adverse
cumulative impact.  We assume that the commission means that the provisions
pertaining to land use designations and minimum parcel sizes, which set basic
limitations on the kinds and amount of development that may occur in the
various parts of the scenic area, are designed to eliminate even the
possibility that development will cause adverse cumulative effects to cultural
resources. 

Only the last four of the cited
provisions appear to speak to that approach.  And, as with the commission's "landscape
approach" to adverse cumulative effects on natural resources, those four
provisions do not appear to us to deliver what is required.  In fact, collectively,
the provisions regulate development on only a small part of the scenic area
lands, and do not even purport to regulate some of the land where commercial
and residential development is most likely to occur (lands designated for Commercial,
Agricultural, and Forest uses).  Moreover, at least two of the cited provisions
are unsuited to the sort of landscape scale regulation that the commission
proposes to use, even on the lands to which they apply:  Although the cited
Public Recreation policy reflects a general concern that Public Recreation land
designations be made with an eye toward avoiding "highly sensitive resources,"
and the cited Residential Land Use policy provides that minimum parcel size on
residential lands shall be "based on" protection of cultural
resources, neither the policies themselves, nor any of the policies or
provisions upon which they operate, actually requires that development on
Public Recreation or Residential land be restricted to a level that will
preclude any adverse cumulative effects to cultural resources.  

Neither do the first two provisions cited
by the commission appear to fulfill the statutory mandates.  Rather, they
merely require that "reconnaissance surveys" be performed for any
proposed use that involves more than a minimal level of ground disturbance, to
determine whether cultural resources might be affected.  Such surveys could be
a useful tool for identifying cultural resources that need protection,
but they do nothing in and of themselves to require that such resources not
be adversely affected, either individually or cumulatively, by commercial,
residential, or mineral resource development.  Neither, as far as we can tell,
are they connected to other provisions that would preclude such adverse
cumulative effects.   

In sum, the provisions that the commission
has cited to this court do not support the commission's claim that the management
plan precludes adverse cumulative effects to cultural resources at a landscape
level:  They do not appear to be directed toward requiring that
commercial, residential, and mineral resource development not cause adverse
cumulative effects to cultural resources.  Neither have we been able to
identify, on our own, other provisions that satisfy the statutory mandate.  We
conclude that, with respect to adverse cumulative effects to cultural
resources, the management plan does not comply with the standards set out at 16
USC §§ 544d(d)(7), (8), and (9). 

10.  To
the extent that the management plan permits certain small scale fish processing
operations on parcels in the scenic area that are designated as Residential,
Small Woodland, and Small-Scale Agriculture, does it violate the Act's
prohibition on industrial development outside of the scenic area's urban areas?

Among the revisions to the management
plan that the commission adopted in 2004 are a number of provisions that appear
under the heading "Small Scale Fishing Support and Fish Processing
Operations."  The most significant of those provisions provides: 


"Small-scale fishing support and fish processing
operations in conjunction with a family-based commercial fishing business may
be allowed on parcels designated GMA Residential, GMA Small Woodland or GMA
Small-Scale Agriculture, subject to the following conditions * * *."


Management Plan, Part II, ch 7 (General Policies and
Guidelines), Small Scale Fishing Support and Fish Processing Operations, GMA
Guidelines 1.  The guideline then sets out various limitations and conditions
that apply to fishing support and fish processing use:  such operations are
allowed only on parcels that are contiguous with the Columbia River and that
include a lawful dwelling; at least one permanent resident of the dwelling must
participate in the operation; the operation may employ only residents of the
dwelling and up to three outside employees; the operation must take place in a
portion of the dwelling, not to exceed 25 percent of the area of the dwelling,
or in an accessory building that does not exceed 2,500 square feet; and the
operation shall support and process fish caught only by the residents of the
dwelling and by up to three outside employees.  Id.  The guideline also
describes the fishing support and fish processing activities that are allowed. 
Of particular relevance is section 1B of the guideline, which lists the
approved fish processing activities:


"The following fish processing activities may be
allowed:  cleaning, gutting, heading, and icing or freezing of fish that is
caught by the family-based commercial fishing business.  Other fish processing
activities shall not be allowed, including, but not limited to, canning,
smoking, salting or brining for wholesale or retail sale." 


Petitioners argue that the listed
fish processing activities are industrial activities and that, by permitting
them to occur on Residential, Small Woodland, and Small-Scale Agricultural
land, the commission has violated the Act's requirement that the management plan
"prohibit industrial development(33)
in the scenic area outside urban areas."  6 USC § 544d(d)(6).(34)  
Petitioners rely on the definition of "industrial uses" provided by
the management plan itself: 


"Any use of land or water primarily involved in: 

"1. Assembly or manufacture of goods or
products,

"2. Processing or reprocessing of raw
materials, processing of recyclable materials or agricultural products not
produced within a constituent farm unit, 

"3. Storage or warehousing, handling or
distribution of manufactured goods or products, raw material, agricultural
products, forest products, or recyclable materials for purposes other than
retail sale and service, or

"4. Production of electric power for
commercial purposes."


Management Plan, Glossary.  Petitioners argue that the
approved fish processing activities -- "cleaning, gutting, heading, and icing
or freezing of fish" -- are industrial uses within the meaning of that
definition, because they involve processing, handling, and distribution of raw
material, i.e., fish.  The commission responds that the fish processing
activities permitted by the revision are sufficiently limited that they do not
qualify as "industrial uses" as defined by the management plan and
that allowing such activities on nonurban land designations does not violate
the Act's requirement that "industrial development" be confined to
urban areas.    

We first note that, although agencies
are bound by their own rules, we afford particular deference to agencies'
interpretations of those rules.  Federal courts have held that a federal
agency's construction of its own regulation is controlling unless it is
"plainly erroneous or inconsistent with the regulation."  Auer v.
Robbins, 519 US 452, 461, 117 S Ct 905, 137 L Ed 2d 79 (1997).  Oregon
courts are almost as deferential to Oregon agencies' interpretations of their
own rules, deferring to an agency's interpretation of its own rule if the
interpretation is plausible and not inconsistent with the rule, the rule's
context, or any other source of law.  Don't Waste Oregon Com. v. Energy
Facility Siting, 320 Or 132, 142, 881 P2d 119 (1994).  Under either
framework, we will defer to the commission's interpretation of the management plan
as long as that interpretation is plausible.

Guided by that standard, we are
persuaded that the fish processing activities allowed by the revision are so
restricted that the revision does not permit "industrial use," as
defined by the management plan.  Under the revision, the land on which the
processing activities occur must include a dwelling, only residents of the
dwelling and three other persons may participate in the processing activities,
the processing activities may occur only on a small part of the parcel (either
in a portion of the residence or in a single accessory building), and only fish
caught by the residents and up to three employees may be processed.  Those
restrictions limit the processing activities to such a degree that, when
individuals use their land in the way described in the revision, the commission
plausibly may state that their "use" of their land cannot be
described as "primarily involved in" the processing of raw
materials.  That is all that is required in order for us to defer to the commission. 
The activities permitted by the fish processing revisions do not constitute
"industrial uses" as defined by the management plan, and the fish
processing revisions do not conflict with the Act's ban on "industrial
development" outside urban areas.  The Court of Appeals correctly rejected
petitioners' claim of error.

11.  Does
the management plan violate provisions in the Act specifying where commercial
uses may occur, given that it allows large-scale commercial events on lands
zoned for Agricultural, Forest, Public Recreation, and Residential uses?

The 2004 revisions to the management plan
set out guidelines pertaining to "commercial events," a category of
uses that "include[s] weddings, receptions, parties and other small-scale
gatherings that are incidental and subordinate to the primary use on a
parcel."  Management Plan, Part II, ch 7 (General Policies and
Guidelines), Commercial Events, GMS Guidelines 1.  In general, those guidelines
allow commercial events on all GMA lands 


"except on lands designated Open Space or Commercial
Forest, subject to compliance with the following conditions and the scenic,
cultural, natural and recreation resource guidelines."


Management Plan, Part II, ch 7 (General Policies and
Guidelines), Commercial Events, GMS Guidelines 2.  The conditions referred to include
requirements that the commercial event occur "in conjunction" with a
lawful winery, tasting room, bed and breakfast, commercial use, or dwelling
listed in the National Register of Historic Places, that the event involve no
more than 100 guests, that the owner of the subject parcel live on the parcel
and manage the use, and that the owner conduct no more than 18 day-long events
each year.  Id. 

Petitioners argue that, insofar as the
"commercial event" provisions permit a use that self-evidently is a commercial
use throughout most of the GMA, they are inconsistent with a provision of the
Act that requires that commercial uses be confined to urban areas and areas
designated by the commission as Commercial land.  Petitioners cite 16 USC §
544d(b)(5), which requires the commission to


"designate areas in the scenic area outside special
management areas used or suitable for commercial development:  Provided, That
such designation shall encourage, but not require, commercial development to
take place in urban areas and shall take into account the physical
characteristics of the areas in question and their geographic proximity to
transportation, commercial, and industrial facilities and other amenities."(35)


The commission responds that neither
the quoted provision, nor any other provision in the Act, requires that
commercial uses occur only in urban areas or on designated Commercial land. 
The commission contends, in fact, that the quoted provision does not prohibit
anything, but simply requires the commission to designate some land within the
scenic area as suitable for commercial development based on the land's physical
characteristics and proximity to transportation and other amenities.  The commission
asserts that it has fulfilled that obligation by designating various lands as
Commercial, Commercial Recreation, and Rural Center lands and by providing
guidelines for the development of those lands.  In making those designations,
the commission adds, it has never made any determination that development that
is permitted on other designated lands cannot be accompanied by incidental and
subordinate commercial uses.  To the contrary, it argues that the management plan
always has permitted some ancillary commercial uses -- cottage industries, produce
stands and the like -- in association with other permitted development throughout
the scenic area, except on Open Space land.

This is a classic situation in which
we cannot say that either proffered construction unquestionably is the one that
Congress intended.  Certainly, it is not beyond reason to interpret 16 USC §
544d(b)(5), as petitioners have, as implying a legislative intention
that, once the commission selects areas that are particularly suitable for
commercial development, it must confine all extra-urban commercial uses to
those areas.  On the other hand, the commission's view of the provision is more
in keeping with the provision's actual words:  On its face, the provision says
nothing about confining ancillary commercial uses outside of urban areas to designated
Commercial lands.  

The best case that can be made for
petitioners is that the provision is ambiguous with respect to the interpretive
issue before us.  And, because it is ambiguous, we must defer to the commission's
interpretation, as long as it is not unreasonable.  Chevron, 467 US at
842-43.  We do not find it to be so:  The idea that Congress did not intend to
confine all incidental, subordinate and, in this case, intermittent commercial
uses to designated Commercial land is not inherently problematic.  Neither are
we persuaded that any of the negative results that, according to petitioners, might
arise out of the application of commission's construction are so egregious that
they render that construction unreasonable.  We conclude that the Act does not,
in fact, contain a requirement that all ancillary commercial activities occur
within urban areas or areas designated as Commercial land.  It follows that the
Commercial Event provisions are not incompatible with the Act in the way that
petitioners suggest.  The Court of Appeals correctly rejected petitioners'
claim of error.

Petitioners have persuaded us that
the revised management plan is in violation of the Scenic Act in a number of
respects, all of which we have identified in earlier parts of this opinion.  We
remand to the commission to correct those violations by removing erroneous
provisions or by promulgating new provisions that satisfy the Act's
requirements.

The decision of the Court of Appeals is affirmed in part and reversed in part. The revisions to the management plan are upheld in part and invalidated in part, and the case is remanded to the Columbia River Gorge Commission for further proceedings.





1. The
secretary is charged with developing guidelines and designations, using a
similar process, for the SMA.  16 USC § 544f.

Return to previous location.



2. The
commission consists of 13 members -- one from each of the six counties with
land that is within the scenic area's boundaries, who are appointed by the
governing bodies of their respective counties; three from Oregon, who are
appointed by the Governor of Oregon; three from Washington, who are appointed
by the Governor of Washington; and one ex officio, nonvoting
member, who is an employee of the United States Forest Service and who is
appointed by the Secretary of Agriculture.  16 USC § 544c(a)(1)(C).

Return to previous location.



3. Much
of the day-to-day implementation of the management plan occurs at the county
level.  The Act therefore requires counties within the scenic area to adopt
land use ordinances that are consistent with the management plan.  16 USC §§
544e(b), (c).

Return to previous location.



4. The
revised management plan and the "original" management plan are
distinct plans for the purposes of this opinion.  However, maintaining that
distinction can be confusing and, in any event, is unnecessary.  In this
opinion, because the object of our review is the revised management plan adopted
by the commission in 2004, we refer to that version (and not to the original
1992 plan) as "the management plan" or "the plan."

The reader
also should be aware that, when we refer to the "management plan" in
this opinion, we are not referring to a paper document, but to the entire body
of law that comprised the revised management plan in 2004.  As far as we can
tell, that body of law was not published in a single paper document.  In 2004,
the commission did publish a compilation of the chapters of the management
plan that it had revised, but that document did not include the many chapters
of the management plan that had not been revised, but remained in
effect.  The management plan also has been amended, as provided in 16 USC §
544d(h), on many occasions since 2004, and an up-to-date version, which
includes all revisions and amendments that currently are in effect, is
available online at http://www.gorgecommission.org.  In this opinion,
for obvious reasons, when we cite provisions in the management plan, we make no
attempt to refer to a particular document, online or on paper, or to page
numbers therein.  Instead, we simply refer to part, chapter, and provision
numbers.

Return to previous location.



5. The
secretary concurred in the revised management plan in August 2004.

Return to previous location.



6. The
Act provides that any person adversely affected by a final action of the
commission relating to the implementation of the Act may obtain judicial review
in the state courts of Oregon and Washington.  16 USC §§ 544m(b)(4), (6)(C). 
ORS 196.115(2)(a) provides that, in Oregon, such review shall be in the Court
of Appeals.   

Return to previous location.



7. See
Sierra Club v. Bosworth, 510 F3d 1016, 1023-24 (9th Cir 2007) (declining to apply the Salerno
standard and discussing its inconsistent use in the federal courts).

Return to previous location.



8. The
Chevron doctrine has been widely criticized.  See, e.g., Laurence
H. Tribe, I American Constitutional Law 997-1002 (3d ed 2000) (Chevron,
in combination with relaxation of nondelegation doctrine, threatens to
"cede large areas of the legal landscape to relatively unaccountable
federal agencies.").

Return to previous location.



9. The
court identified, as the "usual rationales" for deferring to an
agency's interpretation, the principles of "congressional delegation"
and "separation of powers" and the agency's superior expertise with
respect to the subject matter.  The court also concluded that the
notice-and-comment procedures required by the Act demonstrated that Congress
intended to require deference to the commission's interpretations.  Friends
of Columbia Gorge, 215 Or App at 570-77.  We need not agree with the Court
of Appeals' summary of the rationales for the Chevron doctrine to agree
that the doctrine applies to the present case.  

Return to previous location.



10. The
commission cites, among other cases,  People of California v. Tahoe Regional
Planning Agency, 766 F2d 1308, 1313 (9th Cir 1985) (applying Chevron
deference to interstate compact agency); Seattle Master Builders v. Pacific
N.W. Elec. Power, 786 F2d 1359, 1370 (9th Cir 1986) (applying Chevron
deference to Pacific Northwest Electric Power and Conservation Planning Council
(an interstate compact agency)); and NY State Dairy Foods v. Northeast Dairy
Compact, 26 F Supp 2d 249, 260, 265 (D Mass 1998) (applying Chevron
deference to regional compact agency's construction of its own authorizing
statute). 

Return to previous location.



11. See,
e.g., Friends of Columbia Gorge v. Columbia River, 126 Wash App 363,
369-70, 108 P3d 134 (2005) ("The Act gives state courts jurisdiction over
most disputes * * *.  Absent published procedural rules, therefore, we apply
the Washington Administrative Procedure Act, chapter 34.05 RCW.").

Return to previous location.



12. Of course, Oregon courts do not operate on the same set of assumptions about
the intentions of the Oregon legislature.  See generally Springfield
Education Assn. v. School Dist., 290 Or 217, 221-30, 621 P2d 547 (1980)
(explaining how authority to construe statutes is allocated between agencies
and courts depending on type of statutory term that is at issue). 

Return to previous location.



13. Under
16 USC section 544c(b), the commission must adopt regulations 



"relating to administrative procedure, the making of
contracts, conflicts-of-interest, financial disclosure, open meetings of the
Commission, advisory committees, and disclosure of information consistent with
the more restrictive statutory provisions of either State."


Return to previous location.



14. The
Act also provides, among other things, that the secretary will have authority
over certain parts of the scenic area, 16 USC § 544f, that the Oregon
Department of Transportation will develop a plan for restoring the Old Columbia
River Highway, 16 USC § 544j, that designated rivers and streams will be
subject to restrictions set out in section 7(a) of the Wild and Scenic Rivers
Act, 16 USC § 1278(a), 16 USC § 544k, and that the secretary and commission
will provide technical assistance to the six counties in the scenic area, 16 USC
§ 544l.  The Act also authorizes the appropriation of federal funds for
acquisition of land and for various specified projects and sets out procedures
for enforcing the provisions of the Act and for bringing actions against the
commission, the counties, and the secretary, 16 USC §§ 544m, 544n.  All of
those provisions are part of the interstate compact that Congress had in mind,
and Oregon and Washington had no authority or permission to adopt a compact
that did not contain them.

Return to previous location.



15. See
also Investment Co. Institute v. Camp, 401 US 617, 626-28, 91 S Ct
1091, 28 L Ed 2d 367 (1971) (in determining whether Comptroller of the Currency
authorization of banks' creation and operation of investment funds violated
Glass-Steagall Act, Court would not defer to interpretation of the relevant
provision offered by Comptroller's counsel, when Comptroller itself had not
expressly articulated any position at the administrative level as to the
meaning and impact of that provision).  The United States Supreme Court has
explained that distinction on the ground that "'Congress has delegated to
the administrative official and not to appellate counsel the responsibility for
elaborating and enforcing statutory commands.'"  Bowen, 488 US at
212 (quoting Investment Co. Institute, 401 US at 628).  

Return to previous location.



16. The
commission's response in the Court of Appeals focused primarily on its own good
intentions.  It noted that, although the management plan addressed cumulative
impacts in a number of ways, commission staff had reported that that the plan's
cumulative impacts analysis could be improved and that the commission had been
determined to address the issue in the revision process.  The commission
explained, however, that budget constraints had prevented it from acting on
that intention, but that it had developed a long-term plan for addressing the
topic.  It concluded that it had "not abuse[d] its discretion to make no
changes to this topic."  

The Court of Appeals correctly
rejected that argument as unresponsive to petitioners' challenge:  "Either
the management plan, as revised, violates the Act or it  does not.  The fact
that the process by which the Commission arrived at the final product was a
reasonable one does not alter the lawfulness -- or unlawfulness, as the case
may be -- of the product itself."  Friends of Columbia Gorge, 215
Or App at 578.   The court then supplied its own reason for rejecting
petitioners' argument -- that the Act did not require the "standards"
that petitioners were demanding.    

Return to previous location.



17. In
that respect, we think that the Act is unambiguous and that, as such, any claim
to deference under Chevron would be misplaced.

Return to previous location.



18. Although
labeled a "policy," that statement is worded more like a directive or
guideline, and would seem to have a similar legal effect.

Return to previous location.



19. "Key
viewing areas" are designated vantage points that provide "public
scenic viewing opportunities" -- generally, important public roads, parks,
and trails.  Management Plan, Part I, ch 1 (Scenic Resources), GMA
Provisions, Key Viewing Areas, GMA Policies 1; Glossary.

Return to previous location.



20. A structure or land use is "visually subordinate" to its
setting if it "does not noticeably contrast with the surrounding
landscape, as viewed from a specified vantage point."  Management Plan,
Glossary.

Return to previous location.



21. "Landscape
settings" are "the combination of land use, landform, and vegetation
patterns that distinguish an area in appearance and character from other
portions of the Scenic Area."  Management Plan, Glossary. 
The landscape settings designated in the plan include "Pastoral,"
"Coniferous woodland," "Oak-pine woodland,"
"Grassland," "Rural residential," "Residential,"
"Village," "River bottomlands," and "Gorge walls,
canyons and wildlands."  For each landscape setting, the management plan
provides a general description of the land uses, landforms, and vegetation that
are typical, the types of recreational uses that are compatible with the
setting, a recommended parcel size for new land divisions, and a set of
"design guidelines" that are to be used to achieve visual subordinance
for both new and expanding developments.  The design guidelines pertain to the
positioning and height of structures, the type of vegetation to be used for
screening, etc., and are often phrased in precatory, rather than mandatory,
terms.  See generally Management Plan, Part I, ch 1 (Scenic
Resources), GMA Provisions, Landscape Settings.

Return to previous location.



22. The
commission refers specifically to two "scenic travel corridors"
policies:


"A
scenic highway corridor strategy shall be developed and implemented for
Interstate 84 (I-84).  The SR 14 Corridor Strategy (1996) and associated
documents shall continue to be implemented and updated as needed for Washington
State Route 14 (SR 14)."



Management Plan, Part I, ch 1 (Scenic Resources), GMA
Provisions, Scenic Travel Corridors, GMA Policies 1.


"The goals of the scenic corridor
strategies shall include:  1) providing a framework for future highway
improvements and management that meet Management Plan scenic guidelines and
public transportation needs; and 2) creating design continuity for the highway
corridor with the Scenic Area.  Corridor strategies shall, at a minimum,
include: a) design guidelines (e.g. materials, conceptual designs, etc.) for
typical projects that are consistent with Management Plan scenic resources
provisions and b) an interdisciplinary, interagency project planning and
development process."


Id. at GMA Policies 2.

Return to previous location.



23. The
commission also relies on Management Plan, Part I, ch 1 (Scenic
Resources), GMA Provisions, Landscape Settings, GMA Policies 5.  However, that
policy pertains to recreational usage and, as such, does not appear to
be relevant to the issue of the management plan's compliance with the
requirement that residential, commercial, and mineral resource
development take place without adversely affecting scenic resources.  16 USC §§
544d(d)(7), (8), and (9).

Return to previous location.



24. Before
the Court of Appeals, petitioners also argued that the commission's staff had misinterpreted
the policy in a way that violated the Act, i.e., as precluding any
denial of a proposed use based on landscape settings and key viewing areas
guidelines, even when the applicant refuses to take available steps to achieve
compliance with those guidelines.  The Court of Appeals concluded that, insofar
as that argument pertained to a possible interpretation of the Act by
the Commission, it was not ripe for review.  Friends of Columbia Gorge,
215 Or App at 576.  We agree and therefore confine our discussion to
petitioners' alternative argument -- that the policy can only be read in
a way that violates the Act.  

Return to previous location.



25. Notable
in that regard is the fact that the management plan places no limitations on
the conditions that counties may impose on proposed developments to ensure that
they meet the primary scenic protection requirement of visual subordination to
their setting.  See Management Plan, Part I, ch 1 (Scenic
Resources), GMA Provisions, Key Viewing Areas, GMA Guideline 4(B)
("Conditions may be applied to various elements of proposed developments
to ensure they are visually subordinate  to their setting as seen from key
viewing areas, including, but not limited to [siting, retention of
existing vegetation, etc.]").

Return to previous location.



26. 16
USC § 544(l) defines "open spaces" as "unimproved lands not
designated as agricultural or forest lands * * * and designated as open space
pursuant to section 544d of this title.  Open spaces include[, among other
things, fish and wildlife habitat, ecologically significant natural areas,
water areas and wetlands, etc.]."

Return to previous location.



27. See
the list of standards for the management plan set out at 16 USC § 544d(d).  

Return to previous location.



28. We
focus here on the requirements that the management plan contain provisions
precluding adverse effects to natural resources.  16 USC §§ 544d(d)(7), (8) and
(9).  As noted above, petitioners also rely on 16 USC § 544a(1), which states
that one of the purposes of the Act is "to establish a national scenic
area to protect and provide for the enhancement of the * * * natural resources
of the Columbia River Gorge."  However, given that petitioners' claim of
error focuses on supposed omissions from the management plan, the cited
statement of purpose would appear to be irrelevant, because it does not purport
to control the contents of the management plan. 

Petitioners also rely on the
Act's requirements that the commission complete a "resource
inventory" documenting "natural features and limitations" and
"natural resources" in the scenic area, and that it develop land use
designations that are based, in part, on the results of those inventories.  16
USC § 544a(1)(A); 16 USC § 544d(b)(1).   However, petitioners' citation to
those provisions does not appear to add anything to their argument.  The
commission has inventoried "geological features" including,
apparently, "hazards," see Management Plan,
Introduction, Table 1, "Resource Inventories," and it also appears to
have required use of information obtained in that inventory in making land use
and minimum parcel size designations.  See, e.g., Management Plan,
Part II, ch 4, (Residential Land), GMA Provisions, Land Use Policies 1A
("Minimum parcel sizes for land divisions shall be established, based
upon[, among other things,] [a]voidance of hazards, including, but not limited
to steep slopes, fire danger, and groundwater pollution."); Management Plan,
Part I, ch 4 (Recreation Resources), GMA Provisions, Recreation Intensity
Classes, GMA Policies 4 ("Land slope, road access, the presence of
geologic or other hazards and the presence of significant or sensitive resources
shall be primary considerations in determining the suitability of lands for
recreation."); Management Plan, Part II, ch 3 (Open Spaces), GMA
Provisions, GMA Guidelines, Gorge Wall and Canyonlands (reflecting fact that
open space designation may be based on presence of gorge walls and canyons,
which are obvious geological features of the scenic area).

Return to previous location.



29. The
Act does not appear to mean the term in its most traditional sense of naturally
occurring substances that have economic value.  Rather, it also includes
the additional sense that the naturally occurring features and materials are
valued for other than economic reasons.  Nevertheless, the use of the word
"resource" (instead of, for example, "features")
implies that its object is needed, useful, or valuable.  See Webster's
Third New Int'l Dictionary 1934 (unabridged ed 2002) (defining
"resource" as "a new or a reserve source of supply or support: a
fresh or additional stock available at need; something in reserve or ready if
needed * * *.  [R]esource may refer to any asset or means benefitting or
assisting one").  

Return to previous location.



30. See
discussion of Chevron doctrine above, 346 Or at ___ (slip op at 11-21).

Return to previous location.



31. "Natural
areas" are botanically significant sites identified by the Oregon and
Washington Natural Heritage Programs under a contract with the commission.  Management
Plan, Part I, ch 3 (Natural Resources), Inventories and Key Laws and
Programs, Natural Areas.

Return to previous location.



32. 346
Or at ___ (slip op at 35-36).  

Return to previous location.



33. The
Act itself does not define the term "industrial development," as it
is used in 16 USC § 544d(d)(6).

Return to previous location.



34. The
Act designates 13 cities and towns within the scenic area as "urban
areas" and, by reference to a specified map, describes the boundaries of
those urban areas.  16 USC § 544b(e).

Return to previous location.



35. In
the Court of Appeals, petitioners also argued that the Commercial Event
provisions violated 16 USC §§ 544d(d)(1) and (2), which require the commission
to include provision in the management plan to, respectively, "protect and
enhance agricultural lands for agricultural uses" and "protect and
enhance forest lands for forest uses."  Petitioners do not appear to be
pursuing that argument before this court.

Return to previous location.